# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| MELANIE GALIMORE-ROBERTS, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 08-1036 |
| | : | |
| UNITED PARCEL SERVICES, INC., | : | |
| Defendant. | : | |
| | : | |

## Memorandum

YOHN, J.                                                                        June 11, 2009

Melanie Galimore-Roberts brings this employment discrimination suit against United Parcel Service, Inc.[1] ("UPS") raising allegations of violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (Count I), retaliation (Count II), violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* (Count III), and violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601-2654 (Count IV). Defendant moves for summary judgment as to all claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff opposes summary judgment for defendant as to Counts I and III, but plaintiff does not oppose summary judgment for defendant as to Counts II and IV. For the reasons discussed herein, the court will grant defendant's motion.

## I.      Factual Background

For the present motion, the court views all facts and justifiable inferences in the light

---

[1] In the caption of her complaint, plaintiff referred to UPS as "United Parcel Services, Inc." (Compl. at 1) (capitalization omitted). In the body of the complaint, however, plaintiff referred to UPS as "United Parcel Service, Inc." (Compl. ¶ 2.) According to defendant, it is correctly identified as "United Parcel Service, Inc." (Answer at 1.)

most favorable to plaintiff, the nonmoving party.  *See, e.g.*, *Startzell v. City of Philadelphia, Pennsylvania*, 533 F.3d 183, 192 (3d Cir. 2008).  Because plaintiff failed to comply with the court's scheduling order with respect to serving a statement of disputed material facts,[2] the court

---

[2] The court issued a scheduling order on May 21, 2008, paragraph 7 of which stated:

> In addition to a brief, any party filing a motion for summary judgment or partial summary judgment shall file a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the party contends there is no genuine issue to be tried.  The party must support each of the material facts with specific citations to the underlying record, and attach a copy of the relevant portions of that record, if practicable and not already of record.  Failure to submit such a statement of material facts with citations may constitute ground for denial of the motion.
>
> The opposing party shall file a *separate, short and concise statement, responding to the numbered paragraphs in the moving party's statement*, of the material facts as to which the opposing party contends there is a genuine issue to be tried and shall conform to the record citation requirements listed above.  *All factual assertions set forth in the statement required to be served by the moving party shall be deemed admitted unless controverted by the statement required to be served by the opposing party.*

*Galimore-Roberts v. United Parcel Services, Inc.*, No. 08-1036 (E.D. Pa. May 21, 2008) (Doc. No. 9, Scheduling Order) (emphasis added).  In conformance with this order, defendant filed a "Statement of Undisputed Facts" ("Def.'s SUF") as an exhibit to its motion for summary judgment.  (Doc. No. 13-2.)

Plaintiff, however, failed to comply with this order in both form and substance.  Plaintiff did not submit a separate statement responding to Def.'s SUF.  Plaintiff's only filing that could be viewed as an attempt at compliance is her Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 16), which contains a section entitled "Statement of Facts" ("Pl.'s SOF").  Even treating Pl.'s SOF as an attempt to conform to the Scheduling Order, plaintiff failed to comply for several other reasons.  First, while Def.'s SUF contains 110 numbered paragraphs, Pl.'s SOF contains 31 paragraphs that were not ordered or numbered in a way that the court can readily construe as "responding to the numbered paragraphs in the moving party's statement."  Second, Pl.'s SOF simply summarizes wholesale the facts as plaintiff contends them to be; Pl.'s SOF is not a response listing "the material facts as to which the opposing party contends there is a genuine issue to be tried."  Third, although Pl.'s SOF includes some citations to the record, a substantial number of the assertions in Pl.'s SOF lack any citation whatsoever.

Of the 31 paragraphs in Pl.'s SOF, at least 10 have no citation at all, at least 5 feature citations to documents that are not on record with the court, and one features an incomplete

will deem the uncontroverted portions of defendant's Statement of Undisputed Facts ("Def.'s SUF") admitted.  Accordingly, the facts are as follows for purposes of the present motion:

      A.    <u>Plaintiff's Job History at UPS</u>

"UPS is a package delivery company . . . ."  (Def.'s SUF ¶ 1.)  Plaintiff Melanie Galimore-Roberts "is as an African American woman who suffers from fibroid tumors[] and anemia."  (*Id.* ¶ 87.)  Plaintiff "began her part-time employment at [UPS] on November 3, 1995, as an Internal Document Auditor at [UPS's] airport facility in Philadelphia, and remained part-time at UPS until 2006."  (*Id.* ¶ 2.)  "On November 1, 1999, Plaintiff, at her own request, was laterally transferred to the UPS Internal Engineering Department ('IE Dept.')."  (*Id.* ¶ 4.)  "From January 2000, while Plaintiff was employed part-time with UPS, she was simultaneously employed full-time by the Commonwealth of Pennsylvania's Department of Public Welfare, where she continues to be employed full-time to the present day."  (*Id.* ¶ 13.)  "On July 15, 2002, Plaintiff was promoted within the IE Dept. to the position of Administrative Office Technician ('AOT'), and thereafter received a salary raise."  (*Id.* ¶ 5.)

---

citation from which the court can not determine whether plaintiff intended to cite to a document on record with the court.  Moreover, of the documents on record with the court to which plaintiff cites, some do not provide evidentiary support to the assertions for which plaintiff asserts they do.  Plaintiff's brief is long on conclusions and short on evidence in the record to support those conclusions.

      In the interests of justice, despite plaintiff's non-compliance with the scheduling order, the court will not subject plaintiff to the extreme remedy of deeming all of Def.'s SUF admitted.  Though it need not do so, the court will tease through Pl.'s SOF and treat portions of it—those paragraphs which controvert Def.'s SUF and which appropriately cite to the record—as if in compliance with the Scheduling Order.  However, the court will deem admitted all portions of Def.'s SUF not controverted in Pl.'s SOF.  Furthermore, the court will ignore, as nullities, any assertions in Pl.'s SOF for which plaintiff failed to provide any record citations.  For those facts deemed admitted, the court will quote directly from and cite Def.'s SUF, which, in turn, cites the record.

"Plaintiff worked as an AOT in the IE department until she was discharged from UPS on September 12, 2006." (*Id.* ¶ 8.)  "Plaintiff worked part-time, and was given a flexible start-time from 9:30 pm to 10:00 pm." (*Id.* ¶ 6.)  "Prior to 2005, Plaintiff and Antonita White were the only part-time AOTs in the IE Dept.  Both White and Plaintiff enjoyed a flexible time standard that no other employee was permitted.  White was voluntarily transferred to a day position, and thereafter, Plaintiff was the only part-time AOT in the IE Dept. in 2006." (*Id.* ¶ 7.)[3]

"In 2005, Michael Delfin ("Delfin") became Plaintiff's immediate supervisor." (*Id.* ¶ 9.)  "In 2006, Plaintiff reported [to] Mike Delfin (Supervisor), as well as Paul Plechner (IE Night Section Leader) . . . , and James Stubblebine, (IE Section Leader)." (*Id.* ¶ 10.)  "In 2006, Peggy Spayde was the Human Resources representative for the night shift at the UPS Airport Facility." (*Id.* ¶ 11.)  "Approximately 50 to 60 percent of Plaintiff's duties in the IE Dept. were comprised of maintaining the Label Training Certification ('LTC') database." (*Id.* ¶ 12.)

Delfin kept a log regarding plaintiff's attendance and work performance. (Def.'s Mot.

---

[3] Plaintiff asserts that White and Pereira Cassumba, another UPS employee who had worked with plaintiff during the night shift, are African-American. (Pl.'s SOF ¶ 4.)  Plaintiff further asserts that "White claims she complained of racial discrimination to management" and Cassumba "clearly believed he had been treated unfairly and implied that his treatment might be racially motivated." (*Id.* ¶¶ 9-10.)  In total, only five pages of White's deposition are on record with the court.  Nevertheless, plaintiff cites eight pages of White's deposition, with only two of those eight pages being on record.  Nothing in those two pages supports plaintiff's assertion of White's alleged claim of discrimination.  White testified that she disliked Stubblebine calling her by the nickname "trouble" (Dep. of Antonita White 60:3-24, Nov. 5, 2008), but nowhere in any of White's testimony on record does she testify as to a belief that defendant discriminated against her on the basis of race.

In support of her contention regarding Cassumba, plaintiff cites three pages of his deposition, only one page of which is on record.  In fact, that is the only page of Cassumba's deposition on record.  Contrary to plaintiff's assertion, on this page, Cassumba testified that he did not perceive that employees were treated differently on the basis of race when he was in the IE department. (Dep. of Pereira Cassumba 16:7-24, Oct. 24, 2008.)  Accordingly, the court finds that there is no evidentiary basis for plaintiff's claims regarding White and Cassumba.

Summ. J. ("Def.'s Mot.") Ex. 5, "Delfin-3-4".)  "In 2005, Plaintiff took 15 vacation days off from work, 10 discretionary days, called in absent from work 7 times, was late 11 times, and was unable to perform her duties due to improper footwear once."  (*Id.* ¶ 82.)  "In 2006, Plaintiff took 13 discretionary days off (discounting the 12 days she reported were required medical leave), called-out from work 6 times, was absent from work without prior notification 3 times, was late 3 times, and was unable to perform her duties due to improper footwear once."  (*Id.* ¶ 81.)

In plaintiff's May 2005 performance appraisal, Delfin initially assessed plaintiff with an overall rating of 3.63 out of 6; however, Delfin later raised that score to 4.15.  (Def.'s Mot. Ex. 5, "Delfin-3"; Def.'s Mot. Ex. 1 Part 8, "GR-35".)  "On December 12, 2005, Plaintiff received a six-month performance appraisal rating of one out of six for 'punctuality and attendance.'  This rating signifies that the employee 'needs much improvement.'"  (*Id.* ¶ 14.)  "On July 8, 2006, Plaintiff was unable to perform her work because, for the second time in one year, Plaintiff arrived at work wearing improper footwear."  (*Id.* ¶ 15.)  "Plaintiff received poor evaluations regarding her attendance and punctuality in her six-month appraisals on December 12, 2005 and June 29, 2006 . . . ."  (*Id.* ¶ 16.)  The parties dispute whether defendant ever informed plaintiff that one more absence from work would lead to her termination (Dep. of Michael Delfin 33:9-11, Oct. 24, 2008 ("Delfin Dep."); Pl.'s SOF ¶ 20 (citing Def.'s Mot. Ex. 1 Part 8, "GR-29")); therefore, I accept plaintiff's version.  Undisputedly, defendant told plaintiff that the trend in her attendance "would need to change to ensure her employment with UPS."  (Def.'s Mot. Ex. 1 Part 8, "GR-29"; Def.'s SUF ¶ 17.)

"[D]uring the June 29, 2006 performance appraisal, Plechner explained to Plaintiff that Plaintiff had already used her ten permitted discretionary days, plus one additional non-paid

day." (Def.'s SUF ¶ 18.)[4]  It is undisputed that "Plechner informed Plaintiff that it was unacceptable that, despite her uniquely flexible arrangement wherein she was permitted to have a flexible start-time that allowed her to clock into her shift within sixty (60) minutes of the scheduled time, Plaintiff still managed to be tardy." (Def.'s SUF ¶ 19.)  Moreover, Plechner informed plaintiff that she would have received lower evaluation scores from him had he conducted her evaluation rather than Delfin. (*Id.* ¶ 20.)  Plechner also explained to plaintiff that "her attendance influences her performance." (*Id.*)  "In addition to her attendance issues, Plechner discussed with Plaintiff her failure to work efficiently, as her time worked had failed to decrease in proportion to the decrease in her workload." (*Id.* ¶ 21.)  Regarding plaintiff's attendance, Plechner told her she "had a problem and it cannot continue." (Def.'s Mot. Ex. 6.)  Were it to continue "at this pace further discipline [would] follow; up to and including termination." (*Id.*)  "On or around July 17, 2006, Delfin and Plechner met with Plaintiff to address [plaintiff's] repeated violations of UPS employment procedures which prohibit part-time employees from working over five hours a shift without management approval." (Def.'s SUF ¶ 24.)

On August 1, 2006, plaintiff sent Plechner an email in which she expressed "continued unease in working under the current conditions here on the night side and in particular with Mike [Delfin]." (Def.'s Mot. Ex. 1 Part 2, "GR-19".)  Plaintiff further stated:

> I feel that [Delfin] has no respect for me as an individual and I don't trust that he has my best interest at heart when it comes to me improving upon my performance appraisal for the next six month period. I believe that he is acting more towards

---

[4] Plaintiff was permitted to take ten discretionary days off from work (apparently per year). During the June 29, 2006 meeting, Plechner explained that further discretionary days would be unpaid. (GR-29.)

hindering my progress instead of helping.

*Id.* Plaintiff also wrote that her concerns were:

> nothing new between [Delfin] and myself.  It has been going on from the time of his
> promotion to his current position, beginning with the first Performance Appraisal that
> he conducted with me.  I believe that part of that contention stems from the fact that
> I did not agree with that first Appraisal and requested a reconsideration.  Things have
> been touchy ever since.

*Id.*

Plaintiff wrote on her calendar for the summer of 2006 that she met with "Jay [Stubblebine] about prob working on nite side, LTC/Mike/Brenda [Jaskolka], trust issue." (Def.'s Mot. Ex. 1 Part 2, "GR-4".)  Plaintiff also wrote that Stubblebine offered a meeting "with HR," and that plaintiff subsequently emailed Stubblebine to request such a meeting to discuss her "complaint about Mike [Delfin] and office."  (*Id.*)  Plaintiff also wrote on her calendar that she wished to include Antonita White in the meeting "as support."  (*Id.*)  There is no evidence that any such meeting occurred.

"On August 3, 2006, Plaintiff informed Paul Plechner that she would be absent from work on August 4, 2006 and August 21, 2006, and apologized for providing 'such short notice.'" (*Id.* ¶ 25.)  "On August 8, 2006, Plaintiff contacted Mike Delfin to report that she had fallen down the stairs in her home, and would not come to work that night."  (*Id.* ¶ 26; Pl.'s SOF ¶ 27.) "On August 10, 2006, Plaintiff left work early."  (*Id.* ¶ 27.)  Plaintiff also "call[ed] out from work on August 9, . . . August 11, and August 14."  (*Id.*)  "From August 15, 2006 through August 17, 2006, Plaintiff was absent from work, and failed to contact her supervisors to inform them that she would be absent."  (*Id.* ¶ 28.)

"On August 18, 2006, Plaintiff left a message with Damian Ciarmella[5] stating that Plaintiff would be absent from work that evening, and that she had a letter from her doctor indicating that it was necessary for Plaintiff to be absent from work for the following two (2) weeks." (*Id.* ¶ 29.) "Plaintiff provided a letter from her physician dated August 16, 2006 stating that she would be out of work for the following two (2) weeks." (*Id.* ¶ 33; Def.'s Mot. Ex. 1 Part 2, "GR-11".) The letter stated that plaintiff was receiving "daily intravenous iron infusions" as treatment for "iron deficiency anemia." (Def.'s Mot. Ex. 1 Part 2, "GR-11".) "On August 28, 2006, Plaintiff called Delfin and informed him that her doctor advised her to miss an additional week of work. Delfin requested that Plaintiff call again the next day (August 29, 2008) to discuss the situation with Plechner. Plaintiff did not call Delfin or Plechner on August 29, 2006 as she was instructed and had agreed to do." (Def.'s SUF ¶¶ 30-32 (internal citations omitted).) "Plaintiff provided a second letter from her physician dated August 30, 2006, stating that she would be out of work 'this week.'"[6] (*Id.* ¶ 34; Def.'s Mot. Ex. 1 Part 2, "GR-12".) This letter also referred to "daily intravenous iron therapy." (Def.'s Mot. Ex. 1 Part 2, "GR-12".) "Plaintiff provided a third letter from her physician dated September 5, 2006, stating [that plaintiff had received intravenous iron therapy on September 5th and] that Plaintiff could return to work part-time on September 6, 2006." (Def.'s SUF ¶ 35; Def.'s Mot. Ex. 1 Part 2, "GR-13".)

Plaintiff returned to work on September 6, 2006. (Def.'s SUF ¶ 36.) "On September 11, 2008 Plaintiff called into UPS and reported that she would be absent from work that evening due

---

[5] Apparently, Ciarmella is or was a UPS employee; however, he has not been identified to the court as such.

[6] August 30, 2006 was a Wednesday.

to 'complications from a medical procedure.'" (*Id.* ¶ 37.)  "At no point did Plaintiff submit to

Delfin or anyone else at UPS any further letters or documentation from a physician stating her

need to be absent from work past September 6, 2006."  (*Id.* ¶ 38.)  Plechner decided to terminate

plaintiff's employment and Stubblebine approved.  (*Id.* ¶¶ 83-84.)  "On September 12, 2008

Plaintiff met with Delfin, Plechner and Spayde, and was informed that her employment with UPS

was being terminated for her unreformed attendance and performance issues."  (*Id.* ¶ 39.)

Plaintiff's September 11th absence from work prompted her termination.  As Delfin testified:

> Q:   You told her if she missed one more day for the rest of the year she would be
>       terminated?
> A:   Yes, without extenuating circumstances.
> Q:   What's an extenuating circumstance?
> A:   Similar to what she incurred, medical.
> Q:   You terminated her anyway?
> A:   After her medical, after she was absent for a medical, beyond her medical
>       time.
> Q:   What do you mean beyond her medical time?
> A:   We terminated her after she was cleared to come back to work and she took
>       another day.
> Q:   For what reason did you terminate?
> A:   For poor attendance and poor work performance.
> Q:   She took another day after she was cleared to come back to work, is that why
>       you terminated her?
> A:   That was the final reason, yep.
> Q:   Just one day?
> A:   Yes.  There was no other days after that because we terminated her.
> Q:   So she was terminated for being absent on September 11?
> A:   No, she was terminated for her history during the year.
> Q:   If she hadn't been absent on September 11th, would she have been
>       terminated?
> A:   No.
> Q:   So her absence on September 11th was the reason why she was terminated?
> A:   No.
> Q:   It was the final reason why she was terminated; wasn't it?
> A:   Yes, it was a contributing factor, yes.

(Delfin Dep. 33:12-34:20.)

B.      Other Alleged Discriminatory Incidents

"In 2005, Plaintiff, by her own choice and without authorization from management, moved her work station from a desk to a counter-space[7] on the opposite side of the office from the rest of the IE department.  Soon thereafter, Delfin asked Plaintiff to move her work station closer to him and the rest of the IE Dept., so that he could adequately supervise her and that she would be closer to her work group.  Immediately after Plaintiff complained of the 'campaign' to move her seat, Plechner investigated her complaint and found that Delfin's actions were entirely appropriate.

Plaintiff additionally complained to Plechner that she believed Delfin and possibly others had 'deleted' her work on the [LTC] database.  Plechner . . . investigated Plaintiff's complaint and found that the LTC database on which she worked had not been deleted, and was, in fact, protected by a password known only to Plaintiff.  Indeed, the LTC database protected by Plaintiff's password exists on the Company's server to the present day.  Plechner informed Plaintiff of his findings, and further explained that the LTC database she was using, although still present on the system, had been made obsolete by a company-wide update."  (*Id.* ¶¶ 47-53 (internal citations omitted).)  Plaintiff, in contrast, characterized the database situation as a transfer of one or her job responsibilities to another employee.  (Pl.'s SOF; Def.'s Mot. Ex. 1 Part 2, "GR-5".)  Plaintiff complained of the situation in an email to Stubblebine in which she also wrote: "As I told you before, I am nolonger [sic] comfortable working [on] the night side."

_____

[7] With respect to these work spaces, it is unclear whether either is best described as a "desk" or a "counter."  As Pl.'s SOF did not controvert Def.'s SUF in compliance with the court's scheduling order, the court deems the above quoted language admitted.

(Def.'s Mot. Ex. 1 Part 2, "GR-5".)  Also in this email, plaintiff explained that she arrived at her understanding of the database situation "by overhearing conversation in the office."  (*Id.*)

"Plaintiff has . . . [also] alleged that she was prevented from testing in UPS'[s] promotion process based on racial discrimination."  (Def.'s SUF ¶ 54.)  "In order for Plaintiff to have been permitted to take the tests required for promotion consideration, she was required to receive a recommendation from her manager.  In 2006, Plaintiff did not re-submit her letter of intent seeking promotion.  Had Plaintiff sought promotion in 2006, Plechner, her manager, would not have recommended her because her attendance and performance did not merit a recommendation."  (*Id.* ¶¶ 55-56 (internal citations omitted).)

Plaintiff complains that she never received a cake on her birthday but that other (presumably white) UPS employees did.  "Brenda Jaskolska [sic] regularly brought cakes into the IE department for no specific reasons.  Birthday specific cakes were brought in if Jaskolska [sic] and two other UPS full-time employees 'ha[d] time' and 'if [they] remember[ed].'  Birthday cakes were not regularly given to each member of the IE department.[8]  Paul Plechner has been a

---

[8] Plaintiff does not dispute defendant's assertion (which is therefore deemed admitted) that Jaskolka "is a full time AOT at the UPS Airport Facility in Philadelphia whose duties at no time included any sort of supervisory responsibilities over Plaintiff, or anyone else."  (Def.'s SUF ¶ 46.)  As to cakes in the workplace, Jaskolka gave the following undisputed testimony:

Q:     Are there times, for example, when somebody has a birthday and you have a birthday cake, that sort of thing?

A:     There is two girls that work out at the front desk that we socialize with, yeah, that we all, if we have time, if we remember.  That's a big—

Q:     I understand.  So do you remember having, somebody having a birthday cake recently?  When was the last time you remember having a birthday cake?

A:     I bring in cake all the time.  It doesn't specifically have to be for somebody's birthday.  I bake cakes all the time and bring food in.  Birthday cake I would have to say myself probably two years ago.

(Dep. of Brenda Jaskolka 18:1-15, Oct. 24, 2008.)

UPS employee for eighteen years and he has never received a birthday cake from anyone at the Company." (*Id.* ¶¶ 57-58 (brackets in original, internal citations omitted).) "Members of the IE department working the night shift [, the shift during which plaintiff worked,] sit alone at their individual computers and perform their duties—they do not frequently socialize or congregate in the cafeteria." (*Id.* ¶ 59.)

C.    ADA Allegations

"The basis of Plaintiff's ADA claim rests on the assertion that Plaintiff had a disability that required an accommodation of periodic absences from work, but defendant refused to accommodate Plaintiff, and discharged Plaintiff because of her alleged disability." (*Id.* ¶ 86 (citing Compl. ¶¶ 46-47).) As mentioned, plaintiff "suffers from fibroid tumors[] and anemia." (*Id.* ¶ 87.) "Plaintiff provided UPS with three physician letters explaining that her absences from work from August 15, 2006 to September 5, 2006 were necessary to treat her medical condition. Plaintiff never provided UPS with any other notes from her doctors.  In the letters, Plaintiff's doctors explained that Plaintiff was absent due to daily intravenous therapy needed to treat her anemia.  None of the letters, however, mentioned or indicated that Plaintiff would be required to miss any additional work beyond September 5, 2006, and in fact stated that Plaintiff would be able to return to her part-time work schedule starting on September 6, 2006." (*Id.* ¶ 88-90 (internal citations omitted).)

"On August 31, 2006, after Plaintiff had been absent from work for three weeks, Delfin requested that Plaintiff contact Betsy Sullivan in the UPS Human Resources/Disability department, and AETNA, to discuss her medically required absences.  Plaintiff did not call Betsy Sullivan or Human Resources regarding her medical condition, or her recent absences from

12

work."  (*Id.* ¶¶ 91-92 (internal citations omitted).)  "Plaintiff did not request an accommodation

from anyone at UPS."  (*Id.* ¶ 95.)  Neither Stubblebine nor Spayde knew plaintiff had a disability.

(*Id.* ¶¶ 93-94.)  "Plaintiff did not request or apply for any short-term disability, long-term

disability, FMLA, Worker's Compensation, or any other type of leave.  (*Id.* ¶ 96.)  In fact, when

Delfin suggested to plaintiff, apparently in early September 2006, that she inquire about FMLA

leave, plaintiff informed him "I don't need family leave.  I'm coming back to work tomorrow."

(*Id.* ¶ 106 (quoting Pl. Dep. 203:24-204:1, Oct. 22, 2008).)

      D.    <u>UPS Workplace and Anti-Discrimination Policies</u>

     "When [a UPS] employee alleges any form of discrimination occurring at UPS—formally

or informally—[UPS] Human Resources assists the employee in filling out the appropriate

complaint form, and then Human Resources conducts an investigation."  (*Id.* ¶ 107.)

Additionally, UPS has a multi-step employment dispute resolution program ("EDR").  "'The first

step, or Open Door, permits employees to raise and resolve their disputes early and informally.

The next three steps, Facilitation, Optional Peer Review, and Mediation, provide increasingly

sophisticated procedures for investigating and addressing employment disputes that are not

resolved in the Open Door.  The fifth step, Optional Arbitration, provides for final and binding

resolution of all employment disputes before professional arbitrators.'"  (*Id.* ¶ 110 (quoting

"EDR Guidelines," Def.'s Mot. Ex. 1 Part 3, "GR-21").)

      E.    <u>Administrative Procedural History</u>

     Plaintiff filed a charge of discrimination on the basis of race and disability with the Equal

Employment Opportunity Commission ("EEOC") on or about March 7, 2007.[9]  (Compl. ¶ 11;

Def.'s Mot. Ex. 1 Part 2, "GR-9".)  Plaintiff also elected to cross-file with the Pennsylvania

Human Relations Commission ("PHRC").  (*Id.* ¶ 12.)  The EEOC "issued a notice of right to sue

with respect to plaintiff's charge of discrimination" on or about December 5, 2007.  (*Id.* ¶ 13.)

## II.    Discussion

### A.    Legal Standard

A motion for summary judgment will be granted only "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party thus bears the initial burden of

showing that there is no genuine issue of material fact and that it is entitled to relief.  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its initial burden, the

nonmoving party avoids summary judgment by presenting "specific facts showing that there is a

genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585

n.10 (1986) (quoting Fed. R. Civ. P. 56(e)).

"Facts that could alter the outcome are 'material', and disputes are 'genuine' if evidence

exists from which a rational person could conclude that the position of the person with the

burden of proof on the disputed issue is correct."  *Ideal Dairy Farms, Inc. v. John Lebatt, Ltd.*,

_____

[9] Plaintiff's charge also dealt with retaliatory discharge, a claim for which, as mentioned, plaintiff does not oppose defendant's motion for summary judgment.  Plaintiff selected only race and retaliation as the bases of her alleged discrimination on the "EEOC Form 5" that she completed.  However, on her attached description of the discrimination, she also alleged disability discrimination.  (Def.'s Mot. Ex. 1 Part 2, "GR-9".)

90 F.3d 737, 743 (3d Cir. 1996) (quoting *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995)).  The nonmoving party must present concrete evidence supporting each essential element of its claim.  *Celotex*, 477 U.S. at 322-23.  In doing so, the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence" for elements on which she bears the burden of production, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), and may not "rely merely upon bare assertions, conclusory allegations or suspicions," *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).  Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

When a court evaluates a motion for summary judgment, "[t]he evidence of the non-movant is to be believed."  *Anderson*, 477 U.S. at 255.  Furthermore, "all justifiable inferences are to be drawn in [the non-movant's] favor."  *Id.*  "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed."  *Ideal Dairy Farms*, 90 F.3d at 744 (quotation marks and citations omitted).  However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment."  *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

**B.     Counts II and IV**

Plaintiff's complaint raised a claim of retaliation in violation of Title VII in Count II and a claim of violation of the FMLA in Count IV.  Plaintiff, however, does not oppose defendant's motion for summary judgment as to Counts II and IV.  (Pl.'s Mem. Law Opp'n Def.'s Mot.

15

Summ. J. ("Pl.'s Resp.") at 1.)  Plaintiff has, therefore, waived those claims, and the court will

enter judgment in favor of defendant and against plaintiff as to Counts II and IV.

### C.      Count I: Racial Discrimination

In Count I of her complaint, plaintiff raised a claim of racial discrimination in violation of

Title VII.  Plaintiff later clarified that she "has not filed a separate claim for 'harassment'" (Pl.'s

Resp. at 1), so the court will interpret Count I as alleging a disparate treatment claim, not a racial

harassment or hostile work environment claim.  To make out a prima facie case for disparate

treatment, plaintiff must show: (1) she is a member of a protected class; (2) she was qualified for

her position at UPS; (3) she suffered an adverse employment action; and (4) nonmembers of the

protected class, who were otherwise similarly situated, received more favorable treatment or the

circumstances of plaintiff's termination give rise to an inference of unlawful discrimination.[10]

*See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Goosby v. Johnson & Johnson Medical, Inc.*,

228 F.3d 313, 318-19 (3d Cir. 2000).  "Once a plaintiff under Title VII establishes a prima facie

case, the employer must come forward with a legitimate, non-discriminatory reason for the

---

[10] As the Supreme Court explained in *McDonnell Douglas*, the specifications of a prima
facie for a particular plaintiff will vary with the unique facts of the plaintiff's case.  411 U.S. at
802 n.13; *see also Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996) (stating
that prima facie case elements "must not be applied woodenly, but must rather be tailored
flexibly to fit the circumstances of each type of illegal discrimination").  In outlining the
elements of a prima facie case for plaintiff Galimore-Roberts, the court draws from defendant's
Memorandum of Law in Support of Defendant's Motion for Summary Judgment, which includes
a list of elements that are accurately tailored to plaintiff's present claim.  (Def.'s Mem. Law
Supp. Def.'s Mot. Summ. J. ("Def.'s Mem.") at 7.)
    Plaintiff has proceeded under the *McDonnell Douglas* framework, Pl.'s Resp. at 11-15,
and not the "mixed-motive" framework of *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).
The court, therefore, need not discuss the *Price Waterhouse* framework.

adverse employment decision.  If the employer is able to proffer a legitimate, nondiscriminatory

reason for its actions, the plaintiff must demonstrate that the proffered reason was merely a

pretext for unlawful discrimination."  *Goosby*, 228 F.3d at 319 (internal citations omitted).

As to plaintiff's prima facie case, the first and third elements are undisputedly satisfied.

Defendant does not dispute plaintiff's qualifications, and the court will therefore assume, for

purposes of the present motion, that plaintiff has satisfied the second element.  However, plaintiff

has failed to satisfy the fourth element.  Plaintiff has failed to make a showing of unlawful

discrimination or that similarly situated nonmembers of the protected class were treated more

favorably.  Indeed, plaintiff submitted no evidence whatsoever in opposition to defendant's

motion, choosing instead to rely on defendant's evidentiary submissions.  In her deposition,

plaintiff confirmed that the alleged racial discrimination took the following forms: being "fired

for what they said [was] due to too many days out" (Pl.'s Dep. 171:12-21) as well as "the

'campaign to change Melanie's desk,' segregation from the other group members[11], deletion of

her work product from defendant's computer system and removal of the data base needed for

plaintiff's work" (Compl. ¶ 19).  The portion of plaintiff's response to defendant's interrogatory

No. 9 that defendant submitted as an exhibit to its motion alleges an additional form of

discrimination: "refusal to recognize plaintiff's birthday as was the custom for other employees."

(Def.'s Mot. Ex. 1 Part 8, "GR-12" at 12.)[12]

---

[11] Plaintiff did not develop this allegation factually in her opposition to defendant's motion, nor did she submit specific evidence as to it.

[12] As mentioned above, plaintiff has represented to the court that she does not raise a harassment claim, so the court will analyze her racial discrimination allegations solely under the disparate treatment framework.

These allegations alone can not satisfy the fourth element of plaintiff's prima facie case. With respect to all of the above allegations except the birthday allegation, there is nothing in the record which constitutes a showing that other employees, not members of her protected class, were treated more favorably than plaintiff.  Additionally, the record—according to which plaintiff was terminated after repeated attendance and performance issues—does not give rise to a showing of unlawful discrimination.  Regardless of plaintiff's sincerity in raising her allegations, the court must look to the record, which lacks evidence substantiating plaintiff's claims.

With respect to plaintiff's allegation regarding disparate treatment of her birthday, which defendant disputes, plaintiff's allegation also can not satisfy the fourth element.  Plaintiff's interrogatory response stated only that there was a custom of recognizing the birthdays of "other employees."  This allegation does not bear on plaintiff's protected class.  The record does not support, for example, an inference that the birthdays of white employees were recognized whereas the birthdays of non-white employees—two of whom (White and Cassumba) plaintiff specifically identified elsewhere in her submissions to the court unrelated to the birthday allegations—were not recognized.

Moreover, as to plaintiff never having received a birthday cake at work, the court notes the following:  As plaintiff expressed, she does not raise a claim of harassment.  Rather, she claims disparate treatment by her employer.  However, there is no evidence that UPS, plaintiff's employer, had any part—through sponsorship, encouragement, acts of supervisors, or otherwise—in the decisions of plaintiff's co-workers to bring cakes to work.  According to Jaskolka's undisputed testimony regarding cakes, certain UPS employees brought cakes into the

18

workplace as a means of socialization.  There is no evidence that these employees had any supervisory authority over plaintiff.  Plaintiff has not shown how those actions can be attributed to defendant such that they could satisfy the fourth element of plaintiff's prima facie case.

Plaintiff was clearly displeased with her perception of how defendant treated her as an employee, but she has failed to put on record any evidence showing disparate treatment on the basis of her membership in a protected class.  In sum, the record before the court does not give rise to an inference of unlawful discrimination on the basis of race.  Because the record does not support the fourth element of plaintiff's prima facie case, her claim in Count I must fail.

Moreover, even if plaintiff had made out a prima facie case, her Title VII claim would still fail because defendant articulated a legitimate non-discriminatory reason for plaintiff's termination—poor attendance and poor work performance—and plaintiff failed to submit any evidence from which a reasonable fact finder could conclude that defendant's articulated legitimate non-discriminatory reason for firing plaintiff was pretextual.  Accordingly, even if plaintiff had established a prima facie case, defendant would still be entitled to summary judgment.

Plaintiff's arguments regarding pretext are unpersuasive.  First, plaintiff argues that "Mike Delfin admitted that the immediate, but for cause of [plaintiff's] termination was not performance but her absence on September 11, 2006.  This alone supports a conclusion that the other reasons advanced are false."  (Pl.'s Resp. at 14.)  This argument mischaracterizes Delfin's testimony (Delfin Dep. 33:12-34:20), which the court excerpted in section I.A., above.  While Delfin testified that the September 11th absence was the "final reason" for plaintiff's termination, he also clearly explained that it was a "contributing factor" and that defendant fired plaintiff for

"poor attendance and poor work performance," defendant's articulated legitimate non-discriminatory reason.  Delfin's testimony does not support a finding of pretext.

Next, plaintiff argues that:

> defendant's assertion that any absence in excess of discretionary days is grounds for termination is unsupported and false.  There was no specific rule which required termination because of this absence.  The policy prohibiting excessive absence is unspecific and amorphous.  There was nothing which stated or required that this particular absence was grounds for termination.

(Pl.'s Resp. at 14-15.)  Later, plaintiff continues that "[t]here is neither written policy nor prior practice for determining when absences become excessive in the IE department."  (*Id.* at 15.) This argument is misguided to the extent it implies that a private employer can not fire an employee for excessive absence (particularly when the employer has also articulated work performance issues as to the employee) unless, for example, a document "stated or required that this particular absence was grounds for termination."  Plaintiff has not submitted anything to the court suggesting that the terms of her employment were such that defendant could not fire her for the absence and performance issues it articulated.

Ultimately, plaintiff has contributed nothing to the record that suggests defendant's articulated legitimate non-discriminatory reasons were pretextual.  Plaintiff has not shown more than "[t]he mere existence of a scintilla of evidence" as to pretext.  *Anderson*, 477 U.S. at 252. Plaintiff's pretext arguments are based on her suspicions and allegations, which are insufficient to defeat summary judgment.  *Fireman's Ins. Co.*, 676 F.2d at 969.  Thus, even if plaintiff had made out a prima facie case, her claim in Count I would fail because she failed to submit any evidence from which a reasonable fact finder could conclude that defendant's articulated legitimate non-discriminatory reasons were pretextual.  Therefore, the court will enter judgment

20

for defendant and against plaintiff as to Count I.

**D.      Count III: Failure to Accommodate Disability**[13]

In Count III of her complaint, plaintiff raised a claim of disability discrimination (failure

to accommodate) in violation of the ADA.[14]  The ADA prohibits, as disability discrimination,

> not making reasonable accommodations to the known physical or mental limitations
> of an otherwise qualified individual with a disability who is an applicant or
> employee, unless such covered entity can demonstrate that the accommodation would
> impose an undue hardship on the operation of the business of such covered entity[.]

42 U.S.C. § 12112(b)(5)(A) (2006).

> The term "qualified individual with a disability" means an individual with a disability
> who, with or without reasonable accommodation, can perform the essential functions
> of the employment position that such individual holds or desires.  For the purposes
> of this subchapter, consideration shall be given to the employer's judgment as to
> what functions of a job are essential . . . .

42 U.S.C. § 12111(8) (2006).

Although not in the text of the ADA itself, applicable regulations call for an interactive

process between the employer and employee to determine appropriate reasonable

accommodation.  *Conneen v. MBNA America Bank, N.A.*, 334 F.3d 318, 329-30 (3d Cir. 2003)

(citing 29 C.F.R. § 1630.2 and 29 C.F.R. § 1630, app. 1630.9).  The Third Circuit has stated that

"the interactive process must include sufficient notice to inform the employer that an employee is

requesting an accommodation followed by good faith participation of the employer and employee

---

[13] The ADA was recently amended, effective January 1, 2009, pursuant to Pub. L. No.
110-325.  Because these amendments became effective after the events of this case, the court will
refer to the law as it existed before the amendments.

[14] For purposes of the present motion, defendant "assumes without admitting that
Plaintiff's medical conditions constitute a disability within the meaning of the ADA."  Def.'s
Mem. at 20 n.7.)  The court will make the same assumption for purposes of this motion.

21

in that interactive process." *Conneen*, 334 F.3d at 330 (citing *Taylor*, 184 F.3d at 319-320).  The

*Conneen* court further stated:

> The law does not require any formal mechanism or "magic words," to notify an
> employer . . . that an employee needs an accommodation.  *Taylor*, 184 F.3d at 313.
> Moreover, as the court noted in *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d
> 1281, 1285 (7th Cir. 1996), circumstances will sometimes require "[t]he employer
> . . . to meet the employee half-way, and if it appears that the employee may need an
> accommodation but doesn't know how to ask for it, the employer should do what it
> can to help."  However, *either by direct communication or other appropriate means,
> the employee "must make clear that the [he/she] wants assistance for his or her
> disability."  Jones v. United Parcel Serv.*, 214 F.3d 402, 408 (3d Cir. 2000).  The
> employer must have enough information to know of "both the disability and desire
> for an accommodation," *Taylor*, 184 F.3d at 313, or circumstances must at least be
> sufficient to cause a reasonable employer to make appropriate inquiries about the
> possible need for an accommodation.

*Id.* at 332 (emphasis added).

Undisputedly, plaintiff did not request an accommodation from defendant.  In fact,

plaintiff stated in her deposition: "I didn't ask for any accommodations."  (Pl. Dep. 235:12.)

Moreover, Delfin, who was aware that plaintiff was having medical problems, requested that

plaintiff speak with the UPS Human Resources/Disability department, but plaintiff failed to do

so.  Additionally, plaintiff testified that when Delfin suggested she look into FMLA leave, she

responded: "I don't need family leave.  I'm coming back to work tomorrow."  Although FMLA

leave is, of course, distinct from a disability accommodation, plaintiff's testimony demonstrates

both that defendant approached plaintiff regarding her medical condition and that plaintiff failed

to request an accommodation or engage in an interactive process regarding what she now

characterizes as a need for accommodation.[15]

_____

[15] *Conneen* listed the elements required for a plaintiff "to hold his/her employer
responsible for a breakdown in the interactive process under the ADA."  334 F.3d at 330.  Those

The EEOC's Interpretive Guidance on ADA regulations, published as an appendix to the Code of Federal Regulations, informs the court's analysis of this issue.

> Employers are obligated to make reasonable accommodation only to the physical or mental limitations resulting from the disability of a qualified individual with a disability that is known to the employer. Thus, an employer would not be expected to accommodate disabilities of which it is unaware. If an employee with a known disability is having difficulty performing his or her job, an employer may inquire whether the employee is in need of a reasonable accommodation. *In general, however, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.* When the need for an accommodation is not obvious, an employer, before providing a reasonable accommodation, may require that the individual with a disability provide documentation of the need for accommodation.

29 C.F.R. § 1630, app. 1630.9 ("Interpretive Guidance on Title I of the Americans with Disabilities Act") (emphasis added). Other portions of the EEOC's Interpretive Guidance illustrate the responsibility of employees to seek accommodation. For example, the EEOC explains that "*[o]nce a qualified individual with a disability has requested provision of a reasonable accommodation*, the employer must make a reasonable effort to determine the appropriate accommodation." *Id.* (emphasis added). The conditional nature of that statement reinforces the employee's responsibility to request reasonable accommodation when needed. Here, plaintiff failed to request accommodation, even after Delfin spoke with plaintiff about utilizing defendant's Human Resources/Disability department or the FMLA.

---

elements are: "(1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Id.* at 330-31 (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 319-20 (3d Cir. 1999)). Here, plaintiff never requested an accommodation in the first place, so the elements listed in *Conneen* are not fully on point. Nevertheless, the *Conneen* elements are instructive here in that they express the requirement for an employee to, in some way, request an accommodation.

Plaintiff argues that "a disabled employee does not have to ask for an accommodation if the employer has been given sufficient facts to understand that an accommodation is needed." (Pl.'s Resp. at 16.)  In support of this argument, plaintiff cites the EEOC's Interpretive Guidance and *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789 (7th Cir. 2005).  In *E.E.O.C.*, the court explained that, under the particular facts of that case:

> supervisors at three levels of [the employer's] management were aware that [the plaintiff] suffered from neuropathy which made it difficult for her to get to her work area and knew the specific accommodation she was seeking.  A jury could conclude that [the employer] was aware of [the plaintiff's] condition and her desire to be accommodated, thus triggering [the employer's] obligation to engage in the interactive process.

417 F.3d at 804.  Here, in contrast, plaintiff never sought an accommodation, even when prompted to do so by defendant, and plaintiff provided medical notes stating that she would be absent from work for defined periods of time, without indication that she would require accommodation after those periods.  On these facts, unlike the defendant in *E.E.O.C.*, defendant can not be charged with knowledge of a desire, on plaintiff's part, to be accommodated.

Plaintiff also argues that she "had no reason to know that she needed an accommodation because no one ever told her that an additional absence would result in her termination."  (Pl.'s Resp. at 17.)  This argument ignores that accommodations under the ADA enable employees to perform their jobs.  Accommodations are not meant, as plaintiff apparently argues, solely to allow employees to avoid what they perceive as imminent termination.  Moreover, as plaintiff admits, the ADA envisions an "interactive process of accommodation."  (*Id.* at 16.)  Yet, plaintiff's argument that she "had no reason to know that she needed an accommodation" implies that employees should not be expected to engage in the interactive process unless and until their

24

workplace situations have reached levels of such critical strain that a single additional absence would result in termination.

In all, plaintiff's arguments regarding accommodation and the interactive process are unavailing. As the record shows, not only did plaintiff fail to seek accommodation, she also failed to do so even when defendant suggested she utilize FMLA leave or defendant's disability office. Accordingly, plaintiff failed to provide notice to defendant, sufficient for the ADA, that she required and desired accommodation. The interactive accommodation process was never triggered, and defendant's actions can not be considered a "failure to accommodate." Therefore, the court will enter judgment in favor of defendant and against plaintiff as to Count III.

III.    **Conclusion**

Plaintiff has waived her claims in Counts II and IV. Because plaintiff failed to make out a prima facie case for disparate treatment on the basis of race—and because, even if plaintiff had made out a prima facie case, she failed to show that defendant's articulated legitimate non-discriminatory reason was pretextual—the court will enter judgment for defendant and against plaintiff as to Count I. As to Count III, the court will also enter judgment in favor of defendant and against plaintiff because plaintiff failed to provide notice as to her desire for accommodation, and defendant, therefore, can not be liable for a resulting "failure to accommodate."

An appropriate order follows.